UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X

GEORGE BLAIR,

                                 Plaintiff,

      -against-

CITY OF NEW YORK, DEPARTMENT OF
FINANCE, EDWARD SANGUINE, Director of Operations
of the Bush Terminal, Brooklyn, N.Y.,
GALIA GALANSKY, Assistant Commissioner of
Employee Services of the City of New York, Individually
and in their Official Capacities

                             Defendants.

--------------------------------------------------------------------------X

For Online Publication
Only

**MEMORANDUM
AND ORDER**
11–CV–2348 (JMA)

A P P E A R A N C E S:

Moshe C. Bobker, Esq.
Linda Cronin, Esq.
Cronin & Byczek, LLP
1983 Marcus Avenue, Suite C-120
Lake Success, New York 11042
     *Attorneys for Plaintiff*

Adam E. Collyer, Esq.
Megan Burrows Carpenter, Esq.
New York City Law Department
Office of the Corporation Counsel
100 Church Street
Room 2-318
New York, NY 10007-2601
     *Attorneys for Defendants*

**AZRACK**, **United States District Judge:**

      On May 13, 2011, plaintiff George Blair filed this action against the City of New York,

the Department of Finance (the "DOF"), Edward Seguine, and Galia Galansky (collectively,

"defendants") after plaintiff was terminated from his employment at the DOF.  Plaintiff alleges

he was discriminated against on the basis of race and age, retaliated against for engaging in protected activity, and subjected to a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); the Age Discrimination in Employment Act of 1967 ("ADEA"); 42 U.S.C. § 1981; and the New York State and New York City human rights laws ("NYSHRL" and "NYCHRL" respectively).  Plaintiff also alleges equal protection claims in violation of the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.  In March 2014, defendants moved for summary judgment.  (ECF No. 41, 42.)  In March 2015, the parties filed, at the Court's direction, supplemental briefings on three discrete issues. (January 2015 Order, ECF No. 52.)  For the reasons discussed below, the Court grants defendants summary judgment on all federal claims and declines to exercise supplemental jurisdiction on the related state and city claims.

## I.    BACKGROUND

### A.  Plaintiff's Employment with the New York City Department of Finance

Plaintiff is an African-American male, born on April 24, 1961.  (Def.'s Rule 56.1 Statement of Undisputed Facts ("Def.'s 56.1") ¶ 2, ECF No. 44.)  The DOF hired plaintiff on July 7, 1987 as an attendant on a per diem basis.  (Dep. of George Blair ("Blair Dep.") 16:23–24, 35:2–5; Def.'s 56.1 ¶¶ 3–4.)  In August 1990, plaintiff was provisionally appointed to the title of Office Associate in the print shop located at the DOF's Bush Terminal warehouse in Brooklyn. (Def.'s 56.1 ¶ 5; Blair Dep. 50:10–14; 51:11–12.)  Plaintiff remained a provisional employee until his termination on March 19, 2010.  (Def.'s 56.1 ¶¶ 36, 41.)

To become a permanent employee, one must pass a civil service exam, be hired off the civil service list, and go through a probationary period.  (Dep. of Galia Galansky ("Galansky Dep.") 32–33.)  A provisional employee is at risk of losing his or her position or title if another

individual passes the civil service exam for that title and becomes a permanent employee. (Id. at 35–38.)

In an effort to become a permanent rather than a provisional DOF employee, plaintiff took the civil service exam for the Printing Press Operator position in 1992, but did not pass the exam. (Def.'s 56.1 ¶ 9.) This particular exam was not offered again during plaintiff's tenure. (Pl.'s Rule 56.1 Statement of Undisputed Facts ("Pl.'s 56.1") ¶ 9, ECF No. 46.) In 1994, plaintiff filed an out-of-title grievance against the DOF. (See Stip. of Settlement, Sept. 1996, Decl. of Adam Collyer in Supp. of Mot. for Summ. J. ("Collyer Decl.") Ex. N, ECF No. 43.) Plaintiff's grievance was settled in 1996 and that year plaintiff was provisionally appointed to Assistant Printing Press Operator. (Id.; Def.'s 56.1 ¶¶ 8, 44.) Plaintiff filed two more successful out-of-title grievance claims in 2001 and 2006 while working in the same position in the print shop. (Def.'s 56.1 ¶¶ 46–49.)

From 1996 to 2007, plaintiff worked as a provisional Assistant Printing Press Operator. (Id. ¶ 12.) In June 2007, the print shop was closed and plaintiff was reassigned to the warehouse under the provisional title of Supervisor of Stock Workers. (Id. ¶ 19.)

Edward Seguine, who had managed the print shop, was also the manager for the warehouse and stock workers at Bush Terminal. (Galansky Dep. 29:16–30:13.) All three departments were set up in the same location under one division. (Id.)

**B.    Plaintiff's Tenure at the Print Shop and Warehouse**

Plaintiff received favorable performance evaluations while working for the print shop and the warehouse. (Pl.'s 56.1 ¶ 56; Blair Dep. 117:8-11.) However, according to Dorsey Rhodes, plaintiff's friend and co-worker from the print shop, the whole agency was "targeting [plaintiff]," with Seguine "'spearhead[ing]' the behavior." (Pl.'s 56.1 ¶ 57; Dep. of Dorsey Rhodes ("Rhodes

Dep.") 29:11–13.)  Rhodes alleges that this began when plaintiff and Rhodes filed their first out-of-title grievance in 1993.  (Rhodes Dep. 23:6–9, 28:19–29:7.)  According to Rhodes, after he and plaintiff filed their grievance, "the behavior of the whole agency just changed towards the [print] shop."  (Id. at 29:3–7.)  Rhodes's assertion that plaintiff was targeted was based on his observation that the print shop's work "was starting to disappear."  (Id. at 45:2–9.)

During their time in the print shop, both plaintiff and Rhodes sought to be placed in permanent positions and obtain raises.  (Id. at 47–49.)  It appears that they specifically sought to be placed in the Assistant Printing Press Operator position.  First, they were told they could not be placed in that title because the DOF had to hire off the civil service list for that title.  (Id. at 48:4–49:3; Stip. of Settlement, Sept. 6, 1996.)  Two years later, after the civil service list expired, they were then told that there was no money in the budget for raises.[1]  (Rhodes Dep. 49:18–50:10.)

Rhodes also testified that, during plaintiff's time under Seguine, plaintiff had a "bad work environment."  (Id. at 51:8–20.)  According to Rhodes, plaintiff was forced to "walk[] on eggshells" at work because people knew "what's going on with [their] case . . . ."  (Id. at 51:8–20; Pl.'s 56.1 ¶ 63.)  Rhodes also testified that Seguine told a lot of "little lies," which created a bad work environment.  (Rhodes Dep. 51:12–52:21.)  The only specific "lie" discussed in the record occurred when, at a meeting with the "Assistant Commissioner," Seguine stated that he never sent plaintiff out on "the road."  (Id.)  When plaintiff responded that Seguine had told him to go on the road before, Seguine conceded that he may have once or twice.  (Id.; Pl.'s 56.1 ¶ 62.)

---

[1] Plaintiff's evidence concerning the permanent positions and raises that he and Rhodes sought includes few details. In 1996, both plaintiff and Rhodes became provisional Assistant Printing Press Operators as a result of their grievances.  However, it is unclear to what extent plaintiff and Rhodes sought permanent positions, which permanent positions they sought, or how they could obtain permanent positions without taking and passing the civil service exam.  Further, plaintiff provides no details about their request for raises, which appear to have been part and parcel of their request for permanent positions.

On December 17, 2007, Rhodes filed an EEOC Questionnaire against the DOF asserting that the DOF discriminated against him, retailed against him and others for filing grievances, and closed the printing operation without explanation. (Rhodes EEOC Questionnaire, Bobker Decl., Ex. G.) In his EEOC Questionnaire, Rhodes listed plaintiff as someone who was in the same situation as Rhodes and as a witness to the discrimination suffered by Rhodes. (Id.; Pl.'s 56.1 ¶ 68.)

## C.    Plaintiff Requests a Raise

In 2008, while working in the warehouse, plaintiff received a ticket from Galansky and Seguine to attend a DOF social event. (Def.'s 56.1 ¶ 21.) While at the event, plaintiff spoke with the DOF's First Deputy Commissioner Rochelle Patricof about possibly obtaining a raise and promotion. (Id. ¶ 22; Blair Dep. 84:16–25, 85:1–8.) Afterwards, Patricof instructed Galansky to look into this. (Def.'s 56.1 ¶ 23.) Galansky informed Patricof that there were four potential scenarios that would give plaintiff a raise. (Galansky Email dated Sept. 18, 2008, Collyer Decl. Ex. F.) One of these scenarios involved finding plaintiff work under the title Principal Administrative Associate ("PAA"). (Id.) Galansky found a potential position for plaintiff as a PAA at the Sheriff's Office and informed Patricof that she would contact the Office to see if they would consider plaintiff for the position. (Id.; Galansky Email dated Oct. 15, 2008, Collyer Decl. Ex. F.) Although Galansky believed that such a transfer might present plaintiff with a "career track," she also advised Patricof that plaintiff's job in the Sheriff's Office would be in danger if a civil service exam was administered for that position. (Id.; Def.'s 56.1 ¶ 26.) In December 2008, plaintiff met with Sheriff Lindsay Eason, an African-American male, to discuss plaintiff possibly moving to a position with the Sheriff's Office. (Def.'s 56.1 ¶¶ 28–30.)

**D.     Plaintiff's Promotion and Transfer to the Sheriff's Office**

In January 2009, plaintiff was promoted to the title of PAA and assigned to the Sheriff's Office.  (See Ltr. from Richard A. Reichard to Blair dated Jan. 14, 2009, Collyer Decl. Ex. I.) Plaintiff's new position included an annual salary of $58,277, a raise of $7,363 over plaintiff's prior position.  (Blair Job History/Salary Chart, Collyer Decl. Ex. J.)  Plaintiff "loved" working at the Sheriff's Office; his new position was "better than the stock worker job."  (Blair Dep. 96:18–24, 97:13–21, 98:8–11.)  Plaintiff remained a provisional employee in his new assignment as a PAA because he had not passed a civil service examination for the PAA title.  (Id. at 102:8–9.)

In December 2009, plaintiff was informed that he passed the civil service exam for Stock Worker and was given a list number for that position.  (Notice of Results, Dec. 3, 2009, Bobker Decl., Ex. E., ECF No. 47).   Plaintiff, however, was no longer in that position or in the warehouse.

**E.     Plaintiff's Termination from the Sheriff's Office**

In late 2009, the DOF was required to complete a "PEG (Project to Eliminate the Gap) Implementation Plan" to reduce spending by a certain percentage in compliance with recent city-wide budget cuts.  (See PEG Implementation Plan Mem. from Sheriff Eason ("PEG Memo"), Collyer Decl. Ex. K; Def.'s 56.1 ¶ 38; Galansky Dep. 113:17–25, 114:1–12.)  As part of the PEG plan, the DOF required all of its divisions, including the Sheriff's Office, to reduce their budgets by the same percentage.  (Def.'s 56.1 ¶ 38; Galansky Dep. 114:1–12.)  To comply with the PEG plan, Sheriff Eason issued a memorandum detailing the steps his office would take to reduce spending.  (See PEG Memo.)  The memo indicates that "the function of managing the Sheriff's fleet of vehicles [would be] transferred to the DOF Fleet Services," which meant that plaintiff's

PAA position at the Sheriff's Office would be eliminated.  (Id.)  In total, Sheriff Eason proposed laying off nine of his employees.  (Def.'s 56.1 ¶ 40.)

On March 4, 2010, plaintiff received a letter stating that his employment with the Sheriff's Office would be terminated, effective March 19, 2010, "[a]s a result of the growing severity of the City's financial problems."  (Ltr. from David M. Frankel dated Mar. 4, 2010, Collyer Decl. Ex. L.)  At the time of his termination, plaintiff had 23 years of experience at the DOF.  (Pl.'s 56.1 ¶ 66.)  Along with plaintiff, five other provisional employees in the Sheriff's Office were terminated.  (See March 2010 Layoff List, Ex. M.)  No permanent Sheriff's Office employees were terminated as part of the PEG plan.  (Id.)

On August 12, 2010, five months after plaintiff's termination, he received notification that he passed the PAA exam.  (Notice of Results, Aug. 12, 2010, Bobker Decl. Ex. E.)

## II.    DISCUSSION

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.  Id. at 322–23; CILP Assoc., L.P. v. PriceWaterhouse Coopers, LLP, 735 F.3d 114, 123 (2d Cir. 2013).  After the moving party demonstrates an absence of genuine issues of material fact, the non-moving party must produce evidence raising a material question of fact to defeat the motion.  See Fed. R. Civ. P. 56(e); Miner v. Clinton County, N.Y., 541 F. 3d 464, 471 (2d Cir. 2008).  However, "the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).  When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party.  Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005).

**B.     The Parties' Arguments**

Plaintiff maintains that he was:  (1) terminated because of his age and race; (2) retaliated against for filing out-of-title grievances and being named in Rhodes's EEOC Questionnaire; and (3) subjected to a hostile work environment by his supervisor, Seguine.

Defendants contend that plaintiff cannot establish that any of the defendants retaliated against him, discriminated against him on the basis of his race or age, or subjected him to a hostile work environment.  Defendants also raise other subsidiary arguments concerning, *inter alia*, the timeliness of certain claims and the liability of specific parties.  Because plaintiff cannot establish any discrimination, retaliation, or hostile work environment, it is unnecessary to address these subsidiary arguments.

**C.     The McDonnell Douglas Burden Shifting Framework**

In analyzing employment discrimination claims based on indirect or circumstantial evidence, courts use the "burden-shifting" formula set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this framework:  (1) a plaintiff must establish a *prima facie* case of discrimination; (2) after the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action; (3) if the employer articulates such a reason, the burden then shifts back to plaintiff to prove by a preponderance of evidence that the employer's stated reason is merely pretextual and that

discrimination was the actual reason for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802–805; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); Ruiz v. Cnty. Of Rockland, 609 F.3d 486, 491–492 (2d Cir. 2010); Russell v. Cnty. of Nassau, 696 F. Supp. 2d 213, 231 (E.D.N.Y. 2010).

"[A] reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason" for the employer's decision.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original).  If plaintiff fails to "show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate."  Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004).  "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Burdine, 450 U.S. at 253).

**D.    Race and Age Discrimination**

For all purposes relevant to this opinion, plaintiff's § 1981 and § 1983 claims of race discrimination are analyzed under the same standard as plaintiff's Title VII race discrimination claim.  Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 210 n.19 (E.D.N.Y. 2014.) Similarly, plaintiff's § 1983 claim for age discrimination is analyzed under the same standard as plaintiff's age discrimination claim under ADEA.  Shapiro v. New York City Dept. of Educ., 561 F. Supp. 2d 413, 422 (S.D.N.Y. 2008).  Moreover, the framework for analyzing plaintiff's race and age discrimination claims is similar with the only material difference being that, for plaintiff's race discrimination claims, plaintiff must only prove that his race was a motivating factor behind the adverse action, Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008),

whereas for plaintiff's age discrimination claim under ADEA, he must prove that his age was the but-for cause for the adverse action, Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009).[2]

## 1. *Prima Facie* **Case of Race and Age Discrimination**

To establish a *prima facie* case of race or age discrimination under Title VII, ADEA, § 1981, and § 1983, the plaintiff must show that:  (1) he belonged to a protected class or protected age group; (2) was qualified for the position he held; (3) plaintiff suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  Simmons v. Akin Gump Strauss Hauer & Feld, LLP, 508 F. App'x 10, 11 (2d Cir. 2013); Abdu-Brisson v. Delta Air Lines, Inc., 239 F. 3d 456, 466 (2d Cir. 2001); Shapiro, 561 F. Supp. 2d at 422; Molin v. Permafiber Corp., No. 01–CV–9279, 2002 WL 31760215, at *3 (S.D.N.Y. Dec. 9, 2002).

Defendants do not contest that plaintiff has met the first three elements of his *prima facie* case for both race and age discrimination.  The only adverse action at issue is plaintiff's termination.  (Pl.'s Mem. at 10, ECF. No. 45.)  The parties dispute whether plaintiff can establish an inference of discrimination.

An inference of discrimination may be derived from a variety of circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms," the employer's "invidious comments about others in the employee's protected group," "the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."  Abdu-Brisson, 239 F. 3d at 468.

In trying to establish an inference of discrimination, plaintiff takes a scattershot approach, arguing that a jury could infer race or age discrimination based on:  (1) the racial breakdown of

---

[2] Ultimately, even this distinction in the causation requirements is irrelevant.  Even assuming that plaintiff's § 1983 age discrimination claim only requires that age be a motivating factor, the Court would still reach the same conclusions on that claim.

the employees laid off by the Sheriff's Office; (2) the fact that two allegedly similar DOF employees were reassigned to lower-level positions and not terminated; (3) the fact that only two employees were laid off in the warehouse; and (4) Seguine's treatment of plaintiff while plaintiff worked in the print shop and warehouse.  As explained below, none of these facts when viewed individually, or collectively, suggest race or age discrimination.

### a.  The Breakdown of Layoffs in the Sheriff's Office

Plaintiff argues that all the individuals laid off from the Sheriff's Office were provisional African-American employees, with the exception of one provisional Hispanic employee.  (See March 2010 Layoff List.)  However, no inference of discrimination can be drawn from this breakdown given that plaintiff never identifies the race of the provisional employees who were retained in the Sheriff's Office.  Moreover, Sheriff Eason, an African-American, hired the plaintiff and then selected him for layoff within a span of only fourteen months.  "[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to h[im] an invidious motivation that would be inconsistent with the decision to hire," especially "when the firing has occurred only a short time after the hiring."  Grady v. Affiliated Cent. Inc., 130 F.3d 553, 560 (2d Cir. 1997).  Courts are also less likely to infer discrimination where, as here, the person taking the adverse action is in the same protected class as the affected employee.  Benedith v. Malverne Union Free School Dist., 38 F. Supp. 3d 286, 319 (E.D.N.Y. 2014).

With respect to plaintiff's age discrimination claim, the ages of the employees laid off in the Sheriff's Office counter any suggestion of discrimination against older workers.  In fact, four of the five provisional employees from the Sheriff's Office who were laid off with plaintiff were significantly younger than plaintiff.  (See March 2010 Layoff List.)  The dismissal of younger

employees "along with the plaintiff refutes . . . his claim of age discrimination." <u>Chin v. ABN–AMRO North America, Inc.</u>, 463 F. Supp. 2d 294, 303 (E.D.N.Y. 2006) (quoting <u>Kahn v. Pepsi Cola Bottling Group</u>, 547 F. Supp. 736, 739 (E.D.N.Y. 1982)).  Furthermore, as with plaintiff's race discrimination claim, the fact that Sheriff Eason both hired and fired plaintiff within a relatively short period of time cuts against an inference of age discrimination.

### b.  The Reassignments of William Silva and Saverino Sacchetti

Next, plaintiff turns to the DOF's treatment of two allegedly comparable employees—William Silva and Saverino Sacchetti—who worked outside of the Sheriff's Office.  Plaintiff contends that the DOF's decision to reassign, rather than layoff, these employees suggests discrimination.  As explained below, although Silva and Sacchetti were both outside of plaintiff's protected class and had shorter tenures with the DOF than plaintiff, the reassignments of Silva and Sacchetti do not raise an inference of discrimination.

Generally, when a plaintiff attempts to raise an inference of discrimination by comparing himself to other employees outside of his protected class, the "plaintiff must show []he was 'similarly situated in all material respects' to the individuals with whom []he seeks to compare [him]self." <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39 (2d Cir. 2000).  There must be "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." <u>Id.</u> at 40.  In other words, to support the inference that a plaintiff has been treated differently than another employee because of discrimination, that plaintiff must present evidence that the other employee "ha[s] a situation sufficiently similar to plaintiff's." <u>McGuinness v. Lincoln Hall</u>, 263 F.3d 49, 54 (2d Cir. 2001).  "[W]hether or not co-employees report to the same supervisor is an important factor" in

considering allegedly similar employees.  Conway v. Microsoft Corp., 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006) (collecting cases).

Silva is a Hispanic male who had ten years less experience at the DOF than plaintiff. (Pl.'s 56.1 ¶ 67.)  Both Silva and plaintiff were employed as PAAs.  (Id.; Compare Blair Job History/Salary Chart with Silva Job History/Salary Chart, Decl. of Mary Rose O'Connell ("O'Connell Decl.") Exs. 1 & 2, ECF No. 57.)  Silva, however, worked in the Facilities Management Group, a different division than the Sheriff's Office.  (O'Connell Decl. ¶¶ 5–8.) While plaintiff was laid off during the implementation of the PEG plan, Silva was reassigned to a different position, Community Associate.[3]  (O'Connell Decl. ¶¶ 9–10.)  That fact, however, does not suggest discrimination given that Silva worked in a different division.  Notably, there is no evidence that Sheriff Eason, who selected plaintiff for layoff, played any role in Silva's reassignment.  In fact, plaintiff does not even identify who was responsible for reassigning Silva.

Plaintiff's attempt to use Sacchetti as a comparator is similarly flawed.  When plaintiff was laid off, Sacchetti, a younger Italian-American, was reassigned from his position as Supervisor of Stock Workers in the warehouse to the position of City Laborer.[4]  (O'Connell Decl. ¶ 18.)  Again, as with Silva, plaintiff has not offered any evidence suggesting that the decision-maker who selected Sacchetti for reassignment played any role in plaintiff's selection for layoff.  Moreover, unlike plaintiff and Silva, Sacchetti was not even employed as a PAA

---

[3] The record does not indicate whether Silva's new Community Associate position was outside of the Facilities Management Group.  It should also be noted that, at plaintiff's deposition, plaintiff testified that Silva was transferred to the position of "Fleet Coordinator."  (Blair Dep. 107:4–6.)  Payroll records produced by the City conclusively refute that assertion and plaintiff does not address this issue in his supplemental response.

[4] The record does not indicate which division employed Sacchetti as a City Laborer.

when the PEG plan was implemented—further evidence that Sacchetti is not an appropriate comparator.[5]  (O'Connell Decl. ¶ 16.)

The mere fact that Silva and Sacchetti were reassigned when plaintiff was not fails to raise an inference of discrimination.  The cases cited by plaintiff are not to the contrary.  Each of those cases involved reductions within the same department (or a consolidated department) where the same decision-makers who decided to layoff the plaintiff also elected to retain employees outside of the plaintiff's protected class.  See Maresco v. Evans Chemetics Div. of W.R. Grace & Co., 964 F.2d 106 (2d Cir. 1992); Preuss v. Kolmar Labs., 970 F. Supp. 2d 171 (S.D.N.Y. 2013); Vaughn v. Mobil Oil Corp., 708 F. Supp. 595 (S.D.N.Y. 1989).  That is simply not the case here.

Finally, plaintiff argues that defendants have proffered contradictory rationales for the decisions regarding Silva, Sacchetti, and plaintiff.  Defendants' supplemental brief notes that: (1) plaintiff was paid more than Silva; and (2) Sacchetti, who made more than plaintiff, was forced to take a pay cut and lost his salaried position as a result of the PEG plan.  Plaintiff assumes that this means that Silva was retained because he made less than plaintiff.  Based on that assumption, plaintiff contends that he should have been retained over Sacchetti, who made more than plaintiff.  While defendants do note the fact that plaintiff was paid more than Silva, there is no evidence suggesting that Silva was, in fact, retained over plaintiff for that reason.  More importantly, plaintiff again fails to account for the fact that Silva and Sacchetti worked in different departments than plaintiff, belying any connection between plaintiff and the alleged comparators.

---

[5]  As discussed infra, plaintiff suggests that Seguine's treatment of Sacchetti, during the time when both Sacchetti and plaintiff worked in the warehouse, indicates discrimination.  Plaintiff, however, is mistaken in this regard.

### c.    Layoffs at the DOF Warehouse

Plaintiff also points out that, when plaintiff and five other employees were laid off from the Sheriff's Office, only two employees were laid off from the warehouse, where plaintiff used to work.  (Pl.'s 56.1 ¶¶ 65–66.)  Unlike plaintiff, both of those employees had only a year or two of experience.  (Id.)  However, the fact that the warehouse only laid off two employees does not suggest that plaintiff's layoff was discriminatory.  It is undisputed that each division of the DOF was directed to cut a certain percentage of its budget.  (Def.'s 56.1 ¶ 38.)  The fact that the warehouse was able to meet its target budget reduction with only two layoffs does not suggest discrimination, particularly where the record contains no evidence about the warehouse's budget.

Relatedly, plaintiff also contends that defendants "lured" him into leaving the warehouse because they knew that plaintiff's position at the Sheriff's Office would be terminated.  (Pl.'s 56.1 ¶ 64.)  Plaintiff points to no admissible evidence to support such a theory.  Rhodes's "opinion" on this point, (Rhodes Dep. 61:15–22), does not create a genuine issue of disputed fact.

### d.    Seguine's Treatment of Plaintiff  in the Print Shop and Warehouse

Plaintiff contends that when he worked under Seguine, Seguine discriminated against him.  Plaintiff implies that such discrimination indicates that his termination from the Sheriff's Office was also discriminatory.  This argument is flawed on multiple levels.

First, plaintiff cannot establish that Seguine discriminated against him based on his race or age.  Plaintiff relies on Rhodes's conclusory testimony that the DOF "target[ed]" plaintiff and that Seguine "spearheaded" this behavior.  (Rhodes Dep. 29:11–13.)  Those conclusory assertions do not suggest that Seguine discriminated against plaintiff based on his age or race. See Payne v. MTA New York City Transit Auth., 349 F. Supp. 2d 619, 627 (E.D.N.Y. 2004)

(concluding that plaintiff's "unsubstantiated, subjective belief, as embodied in his deposition testimony" that employer attempted to remove him from his position because of his race was insufficient to withstand summary judgment).  Moreover, Rhodes's suggestion that Seguine targeted plaintiff by reducing the work of the print shop and ultimately closing it, (Rhodes Dep. 21:5–19), makes little sense because, after the print shop was closed, plaintiff was retained by Seguine in a different position.

Similarly, plaintiff's own deposition testimony regarding Seguine contains no concrete particulars, but rather is comprised entirely of speculation as to the motives behind Seguine's behavior and the DOF's decisions.  See Payne, 349 F. Supp. 2d at 627.

In plaintiff's opposition brief, plaintiff suggests that Seguine and others discriminated against him by refusing to give him a permanent position and a raise.  According to Rhodes, although he and plaintiff were told, at one point, that there was no money in the budget for raises, one younger white employee who came to work for Seguine received multiple raises and, despite starting "below" plaintiff ended up "above" him.  (Pl.'s 56.1 ¶ 61.)  The Court requested further briefing regarding this younger white employee, who plaintiff did not identify by name or position.  Defendant's supplemental submission revealed that this employee was Sacchetti, a younger Italian-American, and included his payroll records.  Plaintiff's supplemental response, however, did not advance any arguments about Sacchetti's raises during plaintiff's time in the print shop and warehouse.[6]  Accordingly, plaintiff has abandoned those arguments.

In any event, Seguine's treatment of Sacchetti during plaintiff's tenure in the warehouse does not suggest discrimination.  Sacchetti, who had previously worked as a Senior Motor Vehicle Supervisor, was transferred to the warehouse in September 2004 to work under Seguine

---

[6]  Instead, plaintiff's supplemental response focuses solely on the fact that Sacchetti was not laid off during the PEG implementation—an argument disposed of earlier.

as a Supervisor of Stock Workers. (O'Connell Decl. ¶ 14.) Contrary to Rhodes' unsupported assertion that Sacchetti joined the warehouse at a lower salary than plaintiff and received raises until he surpassed plaintiff's salary, the payroll records conclusively establish that Sacchetti's salary was already higher than plaintiff's when Sacchetti joined the warehouse in 2004. (Sacchetti's Job History/Salary Chart, O'Connell Decl. Ex. 3, ECF No. 57.) Notably, at the time, plaintiff was still an Assistant Press Operator; he did not become a Supervisor of Stock Workers until 2007. Moreover, the payroll records indicate that both plaintiff and Sacchetti received annual raises in the warehouse. In one year, 2008, Sacchetti also received one additional raise. That fact, however, does not suggest discrimination because, *inter alia*, the record does not indicate that plaintiff and Rhodes were told, in 2008, that there was no money in the budget for raises.[7] It should also be noted that plaintiff never explains how any actions by Seguine prevented plaintiff from becoming a permanent employee.[8]

Second, even if Seguine did discriminate against plaintiff during plaintiff's time in the print shop and warehouse, any such discrimination would not suggest that Sheriff Eason's decision to select plaintiff for termination from the Sheriff's Office—the only adverse action at issue in this case—was discriminatory.[9] Plaintiff has not offered any evidence suggesting that Seguine played any role in the decision to lay plaintiff off from the Sheriff's Office.

---

[7] Rhodes's testimony regarding the requests for promotions and raises, and the DOF's alleged reasons for not providing them, is simply too vague to allow a fact-finder to draw any inference of discrimination. See *supra* n. 2.

[8] According to Galansky, an employee needs to pass a civil service exam to become a permanent employee. (Galansky Dep. 32–33.) Plaintiff took the civil service exam for the Printing Press Operator position in 1992, but did not pass the exam. (Def.'s 56.1 ¶ 9.) This particular exam was not offered again during plaintiff's tenure. Although plaintiff passed the civil service exam for the Stock Worker position in 2009, by that time plaintiff had already transferred to the Sheriff's Office.

[9] Plaintiff argues that if he had been a permanent employee, he would not have been laid off during the PEG. This argument suggests that earlier decisions that denied plaintiff permanent status—rather than Sheriff Eason's decision to lay him off—were discriminatory. However, plaintiff's papers never identify those decisions—all of which appear to be time-barred—as adverse actions in this suit. In any event, as explained above, plaintiff cannot show that his failure to obtain permanent status was due to discrimination.

Plaintiff has not offered sufficient evidence to establish an inference of discrimination. Even assuming that plaintiff's evidence establishes a *prima facie* case, as explained below, plaintiff is unable to create a factual question on the ultimate issue of whether he was discriminated against.

## 2.  Defendants' Non-Discriminatory Reason and Pretext

Defendants assert that plaintiff, who was only a provisional employee, was terminated as a result of city-wide budget cuts.  (Def. Mem. at 10, ECF No. 42.)   A reduction-in-force is a legitimate, non-discriminatory reason for termination.  Delaney v. Bank of Am. Corp., 908 F. Supp. 2d 498, 509 (S.D.N.Y. 2012) (collecting cases) aff'd, 766 F.3d 163 (2d Cir. 2014).

Thus, the burden shifts back to plaintiff to prove that defendants' legitimate non-discriminatory reason for termination was a pretext for race or age discrimination.

As explained earlier in the discussion of plaintiff's *prima facie* case, none of the facts cited by plaintiff raise an inference of discrimination.   Plaintiff also raises one additional challenge, contending that defendants' non-discriminatory reason is not credible because, although city-wide budget cuts might justify some employees being terminated, defendants do not explain why plaintiff was personally chosen for discharge over other employees.   This argument is not persuasive.  Citing the PEG Memo prepared by Sheriff Eason, defendants assert that plaintiff was "an unfortunate casualty of the City's budget crisis, which required agencies to eliminate positions in an effort to eliminate the gap between their expenditures and allocated budgets."  (Def.'s Mem. at 10.)  Sheriff Eason's PEG Memo explicitly states that plaintiff's position was being eliminated because "[t]he function of managing the Sheriff's fleet of vehicles is being transferred to DOF Fleet Services."  (PEG Memo at 1.)  Plaintiff offers no evidence to undermine this rationale, which explains why plaintiff's specific position was targeted.

Accordingly, no reasonable jury could find that defendants' proffered reason was a pretext for race or age discrimination.    Therefore, summary judgment on plaintiff's race and age discrimination claims pursuant to Title VII, ADEA, § 1981, and § 1983 is granted in favor of defendants.

**E.    Retaliation**

**1.  Plaintiff's Title VII, ADEA, § 1981, and § 1983 Retaliation Claim**

Plaintiff's complaint alleges that defendants retaliated against him in violation of Title VII, the ADEA, § 1981, and the Equal Protection Clause pursuant to § 1983.

Retaliation claims under § 1981 and § 1983 are analyzed under the same standards as Title VII and ADEA retaliation claims.  Villavicencio v. Gure-Perez, 56 F. Supp. 3d 178, 186 (E.D.N.Y. 2014); Bowen-Hooks, 13 F. Supp. 3d at 219; Weber v. City of New York, 973 F. Supp. 2d 227, 264 (E.D.N.Y. 2013).  All of plaintiff's retaliation claims are analyzed under the McDonnell Douglas framework.  Weber, 973 F. Supp. 2d at 264; Benedith, 38 F. Supp. 3d at 322.  To make out a *prima facie* case of retaliation under Title VII, the ADEA, § 1981, and § 1983, "a plaintiff must establish:  (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action."  Georges v. Peters, 581 F. App'x 80, 80 (2d Cir. 2014) (internal quotation marks and citations omitted).  A plaintiff must establish but-for causation to prevail on a retaliation claim.  Id. at 81; Siani v. State Univ. of New York at Farmingdale, 7 F. Supp. 3d 304, 322 n.10 (E.D.N.Y. 2014) (applying the but-for standard to plaintiff's § 1983 retaliation claims).

Plaintiff argues that he satisfies the protected activity element because he filed out-of-title grievances in 1994, 2001, and 2006 and was subsequently named in Rhodes's December 2007

EEOC Questionnaire, which asserted that defendants' conduct underlying those grievances was discriminatory.    After the parties' initial briefing, the Court directed the parties to file supplemental briefs addressing:  (1) whether plaintiff engaged in protected activity when Rhodes named him as a witness and discrimination victim in Rhodes's EEOC Questionnaire; and (2) whether plaintiff can establish a causal connection between that allegedly protected activity and his termination.

It is unnecessary to determine whether plaintiff engaged in protected activity because, even assuming that he did, plaintiff cannot establish a causal connection between the protected activity and his termination.

A plaintiff can prove a causal connection between the protected activity and the adverse employment action by "either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (quoting Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).

Defendants assert, in their supplemental brief, that the record does not suggest a causal connection between Rhodes's December 2007 EEOC Questionnaire and plaintiff's layoff more than two years later.  Plaintiff never responds to this argument and never even attempts to explain, in his supplemental brief, why a causal connection exists.  That alone is reason to grant defendants summary judgment on plaintiff's retaliation claims.  In any event, defendants are correct that the record does not suggest a causal connection.  Although a plaintiff can rely on temporal proximity between protected activity and an adverse action to establish a causal

connection, here, the gap in time is too long to suggest causation.  See Clark Cnty. School Dist. v. Breeden, 532 U.S. 268 (2001) (finding that a 20-month gap between employer's knowledge of protected activity and adverse employment action was insufficient evidence of causation to establish a *prima facie* case); Quarless v. Brooklyn Botanic Garden Corp., No. 11–CV–05684, 2014 WL 2767085, at *6 (E.D.N.Y. June 18, 2014) ("[C]ourts in this circuit 'have consistently held that a passage of more than two or three months between the protected activity and the adverse employment action does not allow for an inference of causation.'" (quoting Murray v. Visiting Nurse Servs., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007))), aff'd, No. 14–CV–2590, 2015 WL 2146248 (2d Cir. May 8, 2015).  Therefore, the Court grants defendants summary judgment on plaintiff's retaliation claims pursuant to Title VII, ADEA, § 1981, and § 1983.

## 2.  Plaintiff's First Amendment Retaliation Claim

Plaintiff's complaint alleges a cause of action for retaliation under the First Amendment. Plaintiff, however, abandoned this cause of action by failing to respond to defendants' motion for summary judgment on this claim.  See Gray v. City of New York, No. 08–CV–2840, 2011 WL 6153635, at *7 (E.D.N.Y. Dec. 12, 2011).  In any event, plaintiff cannot establish an essential element of a First Amendment retaliation claim—namely, that he engaged in a protected First Amendment activity.  See Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011).  Plaintiff's out-of-title grievances in 1994, 2001, and 2006 are not speech protected by the First Amendment.  See Ruotolo v. City of New York, 514 F.3d 184, 190 (2d Cir. 2008) ("A generalized public interest in the fair or proper treatment of public employees is not enough [to establish that the speech is a matter of public concern].").  Therefore, the Court grants defendants summary judgment on plaintiff's First Amendment retaliation claim.

**F.    Hostile Work Environment Claim under Title VII, § 1981, and § 1983**

Plaintiff alleges that defendants are liable for creating a racially hostile work environment in violation of Title VII, § 1981, and the Equal Protection Clause pursuant to § 1983.

The standard for showing a hostile work environment under Title VII, § 1981, and § 1983 is essentially the same.  Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014); Benedith, 38 F. Supp. 3d at 322.

To prevail on a hostile work environment claim, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment."  Benedith, 38 F. Supp. 3d at 313 (internal citations and quotation marks omitted).  A "hostile work environment claim will succeed only where the conduct at issue is so 'severe or pervasive' as to create an 'objectively hostile or abusive work environment' and where the victim 'subjectively perceives the environment to be abusive.'"  Marvelli v. Chaps Cmty. Health Ctr., 193 F. Supp. 2d 636, 651 (E.D.N.Y. 2002) (internal citations omitted).

While "[t]he incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred" they must occur under circumstances in which "the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition."  Svenningsen v. Coll. of Staten Island, No. 01–CV–7550, 2003 WL 21143076, at *2 (E.D.N.Y. Mar. 23, 2003) (citing Gregory v. Daly, 243 F.3d 687, 694–95 (2d Cir. 2001)).  "Everyone can be characterized by . . . race . . . and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination."  Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002).

Plaintiff's hostile work environment claims fail because he cannot establish that any of the conduct that he complains of was directed at him because of his race or age. Here, all of the alleged incidents are facially neutral and there is no "circumstantial or other basis for inferring that" these incidents were in fact discriminatory. Alfano, 294 F.3d at 378.

Plaintiff relies heavily on Rhodes's testimony to support for hostile work environment claims. The Court has already addressed the majority of this testimony in the discussion concerning Seguine's treatment of plaintiff in the print shop and warehouse. As explained earlier, none of that facially neutral conduct suggests discrimination. For his hostile work environment claims, plaintiff also argues that Seguine "would tell a lot of little lies," which forced plaintiff to "walk[] on eggshells" at work. (Rhodes Dep. 51:8–20; Pl.'s 56.1 ¶ 63.) The record, however, only includes one specific incident where Seguine allegedly lied. Nothing about that incident suggests that it was due to plaintiff's race or age.

Accordingly, the Court grants defendants summary judgment on plaintiff's hostile work environment claims pursuant to Title VII, § 1981, and § 1983.

**G.    The NYSHRL and NYCHRL Claims**

Since defendants are entitled to summary judgment on all of plaintiff's federal claims, I decline to exercise supplemental jurisdiction over plaintiff's remaining state and local law claims. See 28 U.S.C. § 1367(c)(3).

### III.     <u>**CONCLUSION**</u>

For the reasons set forth above, defendants' motion for summary judgment is granted on all of plaintiff's federal claims.  Since the Court declines to exercise supplemental jurisdiction over plaintiff's NYSHRL and NYCHRL claims, those claims are dismissed without prejudice. The Clerk of Court is directed to enter judgment accordingly and close the case.

**SO ORDERED.**

      /s/ (JMA)
Joan M. Azrack
United States District Judge

Date:  June 3, 2015
      Central Islip, New York